**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Mustaf Adan Arale,<br>aka Mohammed Abdirahman Osman,<br><br>Defendant. | No. CR-18-01584-TUC-RM (BGM)<br><br>**REPORT AND RECOMMENDATION** |

    Currently pending before the Court is Defendant Mustaf Adan Arale's Motion to Suppress Involuntary Statement (Doc. 62). The Government has filed its response, and there was no reply. Govt.'s Response to Def.'s Mot. to Suppress Involuntary Statement (Doc. 73). Defendant Arale is charged with five (5) counts of making a false statement under oath in an immigration matter, in violation of Title 8, United States Code, Section 1546(a); two (2) counts of making false statements to a Department or Agency of the United States, in violation of 18 U.S.C. § 1001(a)(2); and one (1) count of aiding and abetting false statements to a Department or Agency of the United States, in violation of 18 U.S.C. §§ 1001(a)(2) & 2. Indictment (Doc. 3). Defendant Mustaf Adan Arale seeks suppression of his statements because they were allegedly involuntary. *See* Def.'s Mot. to Suppress (Doc. 62) at 9–13.

    Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for an evidentiary hearing and a report and recommendation. On February 27, 2019, an evidentiary hearing was held before Magistrate Judge Macdonald regarding the motion.

Minute Entry 2/27/2019 (Doc. 88). Subsequently, Defendant filed his Supplemental Authorities in Support of Motion to Suppress Involuntary Statement (Doc. 96) and the Government filed its Response (Doc. 97). This matter is now ripe for adjudication. The Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motion.

I.     **FACTUAL BACKGROUND**

On May 24, 2017, Federal Bureau of Investigation ("FBI") Special Agent ("SA") Benjamin T. Trentlage was assigned to the Joint Terrorism Task Force ("JTTF") in Tucson, Arizona. Hr'g Tr. 2/27/2019 (Doc. 95) at 14:24–15:8, 17:21–24. SA Trentlage has been employed with the FBI for approximately nine (9) years and assigned to the JTTF for approximately eight (8) years. *Id.* at 15:3–8, 73:13–14. SA Trentlage testified that the JTTF investigates terrorism and national security matters. *Id.* at 15:9–11. SA Trentlage further testified that one of the terrorist organization that the JTTF is tasked with investigating is al-Shabaab. *Id.* at 15:12–14, 20:9–11. SA Trentlage described al-Shabaab as the primary terrorist group active in East Africa in countries such as Somalia and the area surrounding it. *Id.* at 20:12–18. SA Trentlage further testified that al-Shabaab's predecessor, the Islamic Courts Union, controlled major portions of Somalia for a significant amount of time. Hr'g Tr. 2/27/2019 (Doc. 95) at 20:12–18.

SA Trentlage is one of the case agents assigned to Mr. Osman's case. *Id.* at 15:15–17, 37:7–9. SA Trentlage confirmed that the charges in the indictment stem from allegations that Mr. Osman made materially false and fraudulent statements to the United States Citizenship and Immigration Services in connection with several applications that he submitted. *Id.* at 16:1–6. SA Trentlage further confirmed that these applications included a registration for classification as a refugee ("I-590") and an application for permanent resident status ("I-485"). *Id.* at 7–15. SA Trentlage also confirmed that Mr. Osman submitted written applications, as well as participated in an oral interview. *Id.* at 16–19. Among the misrepresentations that Mr. Osman allegedly made were giving a

false name of Mustaf Adan Arale; stating that he was from Somalia; that his father's name was Adan Arale Omar, born in Somalia; denying that he ever used any other names; denying that he was personally acquainted with anyone who had been involved with a foreign terrorist organization or insurgent group; denied ever having been affiliated with a rebel or insurgent group or organization; and that he had been injured in an attack by al-Shabaab at the Bakaara Market in Somalia in June 2010. *Id.* at 16:20–17:20.

### *A.  Search Warrant Execution*

On May 24, 2017, the FBI obtained and executed a search warrant on Mr. Osman's home that he shared with his wife and children. Hr'g Tr. 2/27/2019 (Doc. 95) at 17:21–25:2. SA Trentlage testified that a variety of items, including identification documents, such as passports or ID cards, and electronic devices, such as cellular telephones and tablets, were seized during the search. *Id.* at 18:3–9. SA Trentlage further testified that at various times following execution of the search warrant, agents returned property to the defendant. *Id.* at 18:10–12. He explained that items were returned if it was determined that the item was not of evidentiary value, or if the item had been forensically examined and the original device was no longer needed. *Id.* at 18:10–17.

### *B.  Return of Evidence*

On June 22, 2017, FBI SA Jon Edwards was assigned to the JTTF in Tucson, Arizona. Hr'g Tr. 2/27/2019 (Doc. 95) at 6:5–11. SA Edwards has been employed with the FBI for approximately eighteen (18) years and assigned to the JTTF for approximately four and a half (4 1/2) to five (5) years. *Id.* at 6:7–13.

At approximately 2:30 p.m. on June 22, 2017, SA Edwards and SA Ian Cruikshank of the Department of Homeland Security ("DHS") Homeland Security Investigations ("HSI") returned items of evidence seized during the execution of a search warrant to Defendant Osman. *Id.* at 7:2–14, 12:1–4. SA Edwards testified that he and SA Cruikshank went to Mr. Osman's residence to return the items. *Id.* at 7:2–16. SA

Edwards further testified that during that visit, he and SA Cruikshank spoke with Mr. Osman for approximately thirty (30) minutes. *Id.* at 7:17–24. SA Edwards also testified that Mr. Osman appeared to understand English and did not ask for an interpreter. Hr'g Tr. 2/27/2019 (Doc. 95) at 7:25–8:12. SA Edwards testified that he and SA Cruikshank were returning a cellular telephone, as well as retrieving a recovery key for another electronic device, which SA Edwards believed to be a tablet. *Id.* at 8:13–17, 11:6–20. SA Edwards testified that during the time Mr. Osman was filling out the receipt for the return of property or while they were discussing the recovery key, Mr. Osman stated that he was worried about the investigation, and that he had lied to Immigration. *Id.* at 8:18–9:4, 12:5–23. SA Edwards mentioned to Mr. Osman that there were important issues that the FBI would like to talk to him about. *Id.* at 9:5–13. SA Edwards testified that these issues included potential terrorism cases that Mr. Osman might have knowledge about overseas or here in the United States. *Id.* at 9:14–16. SA Edwards further testified that Mr. Osman was not in custody during the meeting, and appeared concerned and sincere regarding his worry. Hr'g Tr. 2/27/2019 (Doc. 95) at 9:17–20, 10:12–15. SA Edwards also indicated that he was not surprised by Mr. Osman's admission, noting it was consistent with the environment and what was happening. *Id.* at 13:25–14:5. SA Edwards explained that any knowledge that Mr. Osman may have regarding possible connections to terrorism would have been of interest to the FBI for intelligence reasons. *Id.* at 10:2–11. SA Edwards testified that neither he nor SA Cruikshank questioned Mr. Osman regarding the facts of the instant case, and that any questioning was limited to the recovery key. *Id.* at 10:16–23. SA Edwards further testified that there were no promises made to Mr. Osman during this meeting. *Id.* at 13:2–13.

### C. *The Interview*

On June 27, 2017, SA Trentlage and SA Cruikshank returned to Mr. Osman's home for an interview. Hr'g Tr. 2/27/2019 (Doc. 95) at 19:1–20, 37:15–18. SA Trentlage testified that they were interested in what Mr. Osman wanted to tell them, and hoped that he would provide information regarding al-Shabaab activity either in the

United States or abroad. *Id.* at 19:21–20:8. SA Trentlage further testified that prior to this date, the FBI had information that Mr. Osman had been connected with al-Shabaab. *Id.* at 20:19–22. SA Trentlage explained that the FBI had received information from foreign partners that indicated that Mr. Osman's brother, uncle, and aunt had all been convicted in abstentia in Somaliland for their connection to a bombing attack in Djibouti. *Id.* at 20:23–21:6. SA Trentlage also testified that two of those relatives, including Mr. Osman's brother, remain fugitives. *Id.* at 21:7–10.

SA Trentlage testified that he and SA Cruikshank knocked on the door of Mr. Osman's residence, he invited them in, and they sat down and began to talk. Hr'g Tr. 2/27/2019 (Doc. 95) at 21:11–15. SA Trentlage further testified that only he and SA Cruikshank were present, and they were wearing business casual plainclothes, their firearms were not visible, and they did not have visible handcuffs. *Id.* at 21:18–22:7. SA Trentlage also testified that it was his understanding that Mr. Osman had invited the agents to his home and confirmed that Mr. Osman did not appear surprised when he and SA Cruikshank appeared and welcomed them both in. *Id.* at 22:8–15. SA Trentlage identified Defendant Osman as the individual who was present at the June 27, 2019 meeting. *Id.* at 22:16–23.

SA Trentlage testified that both he and SA Cruikshank carried audio recorders and recorded the conversation. *Id.* at 22:25–23:4, 29:6–9, 38:18–24. SA Trentlage further testified that a review of the transcript from that recording appeared accurate. Hr'g Tr. 2/27/2019 (Doc. 95) at 23:5–21; *see also id.* at 38:25–39:2. The interview started with SA Cruikshank indicating that the reason the agents were there was due to his prior interaction with Mr. Osman and Mr. Osman's statement that he had lied to Immigration and wanted to talk. *Id.* at 24:5–11. SA Trentlage testified that he and SA Cruikshank advised Mr. Osman that he was welcome to ask any questions. *Id.* at 24:12–15. SA Trentlage further testified that at the time of the interview, Mr. Osman was not under arrest or charged with a crime. *Id.* at 24:16–20. SA Trentlage also testified that Mr. Osman brought up the Miranda advisement, which he had been given when the search

warrant was executed. *Id.* at 24:25–25:14, 39:7–41:9. SA Trentlage testified that he and SA Cruikshank again advised Mr. Osman of his Miranda rights and reiterated that those rights applied to Mr. Osman during the interview. Hr'g Tr. 2/27/2019 (Doc. 95) at 25:3–23, 39:7–41:9.

SA Trentlage confirmed that Mr. Osman spoke and appeared to understand English. *Id.* at 25:24–26:2. SA Trentlage further testified that he did not recall Mr. Osman asking for clarification or an interpreter, and SA Trentlage did not have any problems understanding him. *Id.* at 26:3–8. SA Trentlage also testified that Mr. Osman did not appear fearful of the agents, but did ask them for some kind of guarantee or promise that he would receive lesser charges. *Id.* at 26:13–27:7, 54:21–55:13, 61:2–16. SA Trentlage testified that the issue of a guarantee seemed important to Mr. Osman, and the agents responded that the only guarantee or promise that they could make was that if he was honest with them, they would relay that information to the prosecutor. *Id.* at 27:4–22, 29:19–30:1, 46:15–25, 47:17–49:10, 52:8–53:17, 55:3–57:3, 61:2–62:1, 73:18–25. SA Trentlage confirmed that SA Cruikshank indicated to Mr. Osman that there was a prosecutor assigned to his case, and that SA Cruikshank had been in touch with her. Hr'g Tr. 2/27/2019 (Doc. 95) at 53:18–54:17. SA Trentlage further testified that he recalled telling Mr. Osman that honesty was well regarded in the United States' legal system an that people who were honest usually had better legal outcomes than those who were not. *Id.* at 27:23–28:3, 62:17–63:16, 77:7–16. SA Trentlage acknowledged that SA Cruikshank had promised that if Mr. Osman was honest with the agents, SA Cruikshank would tell the prosecutor that the information obtained was more important that the immigration charges. *Id.* at 57:12–58:20, 62:2–16, 71:3–20. SA Trentlage also confirmed that SA Cruikshank indicated that he could not make any guarantees, but could make recommendations to the prosecutor. *Id.* at 59:1–12, 70:8–71:13, 74:16–23, 75:7–76:12. SA Trentlage testified that he spoke to Mr. Osman about the desirability of developing trust between the JTTF and Mr. Osman, as well as suggesting that if Mr. Osman assists them, it might be possible to meet with the prosecutor regarding the

immigration charges. *Id.* at 59:13–61:1.

SA Trentlage confirmed that SA Cruikshank indicated to Mr. Osman that he had the opportunity to tell the agents what they hoped to know; information which related to intelligence matters that were more important to the agents than the immigration charges. Hr'g Tr. 2/27/2019 (Doc. 95) at 40:20–43:11, 66:24–67:8. SA Trentlage agreed that Mr. Osman was primarily concerned with his family and his possible criminal exposure and possible immigration problems. *Id.* at 43:12–14, 43:19–44:18, 67:14–68:7. SA Trentlage confirmed that SA Cruikshank indicated to Mr. Osman that in order for there to be any possibility for his family to stay in the United States, Mr. Osman needed to have a conversation with the agents. *Id.* at 63:20–66:2, 78:17–79:5. SA Trentlage testified that Mr. Osman distinguished the agents from Somali security forces and acknowledged that the immigration charges would continue even if he helps the agents in the long-term. *Id.* at 44:19–45:12.

SA Trentlage testified that he wanted Mr. Osman to give him information, and hoped that the information would include what Mr. Osman meant about his previous lie to Immigration, as well as information regarding al-Shabaab and its operatives and activities. *Id.* at 28:4–17, 28:25–29:5. SA Trentlage further testified that he and SA Cruikshank knew that Mr. Osman had some connection with al-Shabaab and viewed him as someone who could provide information regarding the same. Hr'g Tr. 2/27/2019 (Doc. 95) at 28:18–24. SA Trentlage also testified that he and SA Cruikshank talked to Mr. Osman about the fact that they were all part of the same community, and the agents were just trying to keep the community safe. *Id.* at 68:20–69:20. SA Trentlage testified that Mr. Osman decided that he wanted to speak with the agents. *Id.* at 29:10–18. SA Trentlage testified that they began the interview by asking Mr. Osman his name. *Id.* at 30:7–9. Mr. Osman stated that his birth name was Mohamed Abdirahman Osman. *Id.* at 30:10–17. SA Trentlage testified that throughout Mr. Osman's immigration documents, however, he used the name Mustaf Adan Arale. Hr'g Tr. 2/27/2019 (Doc. 95) at 30:18–20. SA Trentlage further testified that Mr. Osman stated that Adan Arale was a friend he

knew while living in Mogadishu, who took him to the hospital when Mr. Osman was injured, but provided his own name on the hospital paperwork. *Id.* at 30:21–31:2. SA Trentlage also testified that after his release from the hospital, Mr. Osman stated that he used that hospital paperwork to apply for passports and other immigration proceedings. *Id.* at 31:3–5. SA Trentlage testified that Mr. Osman explained that he was living in Kenya and applying for passports in that country, but did not have any family members or other identity documents, so the only thing he had with a name on it was the hospital paperwork. *Id.* at 31:7–14. SA Trentlage confirmed that he used the name "Mustaf Arale" on his refugee application and subsequent legal permanent residence application, and noted that although Mr. Osman initially said he was from Somalia, it was later learned that he is from Ethiopia. *Id.* at 31:15–24. SA Trentlage further testified that Mr. Osman stated his father's name was Abdirahman Osman; however, on his immigration document he gave a different name. Hr'g Tr. 2/27/2019 (Doc. 95) at 31:25–32:6. SA Trentlage also testified regarding a "study guide" that was found during the May 2017 search warrant execution, and indicated that Mr. Osman had prepared the document for his wife to study in preparation for immigration proceedings. *Id.* at 32:7–20.

SA Trentlage testified that he and SA Cruikshank asked Mr. Osman about his connections with al-Shabaab. *Id.* at 32:21–33:8. SA Trentlage noted that Mr. Osman admitted that he had been approached for recruitment by al-Shabaab, but Mr. Osman said that he was uncomfortable speaking about it. *Id.* at 32:21–33:8, 76:17–77:6. The agents told Mr. Osman that he did not have to speak about anything he was uncomfortable with and changed the topic. *Id.* SA Trentlage further testified that he and SA Cruikshank spoke with Mr. Osman about providing false names and refugees, and Mr. Osman indicated that he believed that it was a very common practice for Somali refugees in the United States to come under fake names. Hr'g Tr. 2/27/2019 (Doc. 95) at 33:9–17. SA Trentlage also testified that Mr. Osman told the agents how he sustained his injuries and gave information regarding a group of ten (10) to twenty (20) al-Shabaab members that were sent overseas to obtain legal status. *Id.* at 34:1–7. SA Trentlage testified that the

agents understood the group of al-Shabaab operatives were sent overseas in order to further the objectives of al-Shabaab through planning attacks or bringing other members overseas to foreign countries. *Id.* at 34:8–15. SA Trentlage also testified that Mr. Osman stated that America had been good to him. *Id.* at 36:1–3.

SA Trentlage further testified that the agents' conversation with Mr. Osman lasted approximately two (2) hours. *Id.* at 34:16–18. SA Trentlage also testified that at no time during the interview did Mr. Osman ask the agents to leave, and when Mr. Osman said he did not want to speak about his connection to al-Shabaab, the agents changed the topic. *Id.* at 34:19–35:2. SA Trentlage testified that neither he or Agent Cruikshank made any promises of leniency or dismissal of the charges to Mr. Osman. Hr'g Tr. 2/27/2019 (Doc. 95) at 35:3–7. SA Trentlage further testified that neither agent told Mr. Osman that he would be able to stay in the country. *Id.* at 35:8–10. SA Trentlage also testified that they did mention that it was a possibility that Mr. Osman's family might be able to stay in the country if he provided information, but that this was never promised. *Id.* at 35:11–14, 63:20–65:8. SA Trentlage testified that the agents never coerced Mr. Osman to speak and that he seemed willing to provide additional information. *Id.* at 35:15–16, 23–25. SA Trentlage further testified that the agents expected to attempt to verify some of the information after the interview in order to verify its truthfulness, and then continue speaking with Mr. Osman. *Id.* at 35:17–22, 74:24–75:6. SA Trentlage also testified that the FBI had made further efforts to speak with Mr. Osman, but those efforts were unsuccessful. *Id.* at 72:21–73:4.

## II.     ANALYSIS

Defendant seeks suppression of Defendant's statements, arguing that they were not voluntary due to the promises made by the agents. Def.'s Mot. to Suppress (Doc. 62) at 9–13. Defendant relies on the Supreme Court of the United States' decision in *Bram v. United States*, 168 U.S. 532 (1897) to urge that any inducement by agents was improper and therefore requires suppression. Def.'s Mot. to Suppress (Doc. 62) at 9–13. The

Government asserts that because "[D]efendant's motion does not contend that there was any violation of his rights under *Miranda v. Arizona* when he spoke with agents on June 27, 2017[,] . . . it is undisputed that the [D]efendant's statement was voluntary under *Miranda*." Govt.'s Response to Def.'s Mot. to Suppress (Doc. 73) at 5. The Government further notes that an agent's promise to inform the prosecutor regarding cooperation does not render a statement involuntary. *Id.* at 10 (quoting *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)).

### A. *Miranda*[1]

#### 1. In General

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The Supreme Court of the United States has "recognized that custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Moran v. Burbine*, 475 U.S. 412, 420, 96 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966)). "To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran*, 475 U.S. at 420, 96 S.Ct. at 1140. Specifically, the Court has found the Constitution requires "that a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "An officer's obligation to administer *Miranda* warnings attaches . . . 'only where there has been such a restriction on a

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966).

- 10 -

person's freedom as to render him "in custody."'" *Stansbury*, 511 U.S. at 322 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

### 2. In Custody

"Custodial" means taken into custody or otherwise deprived of freedom of action in a significant way. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom of action in any significant way."). "Two discrete inquiries are essential to the ["in custody"] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995). The Ninth Circuit Court of Appeals has further delineated that "[t]o determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (quoting *Stansbury v. California*, 511 U.S. 318, 322, 144 S.Ct. 1526, 128 L.Ed.2d 293 (1994)). The non-exhaustive list of factors considered by the court in *Kim* included: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Kim*, 292 F.3d at 974 (citations omitted). Subsequently, the Ninth Circuit Court of Appeals relied on several factors in assessing whether an in-home interrogation was custodial, including: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008). "[T]he initial

- 11 -

determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323, 144 S.Ct. at 1529.

Here, it is undisputed that Defendant Osman was not in custody at the time of his discussions with Special Agents Cruikshank and Trentlage. The agents came to his home by agreement, Defendant Osman invited the agents in, and was free to ask them to leave at any time. As such, the conversation was non-custodial and no violation of *Miranda* occurred.

### *B.* *Due Process*

The Constitution directs that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V; *see also* U.S. Const. amend. XIV (as applicable to the states). "[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause[.]" *Miller v. Fenton*, 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985). Further, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause[.]" *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). Indeed, "the voluntariness determination has nothing to do with the reliability of jury verdicts; rather, it is designed to determine the presence of police coercion." *Id.* at 168, 107 S.Ct. at 522.

"A waiver is voluntary if, under the totality of the circumstances, the confession was the product of a free and deliberate choice rather than coercion or improper inducement." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (citations omitted); *see also Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986). The Government "bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, [and] . . need prove waiver only by a preponderance of the evidence." *Connelly*, 479 U.S. at 168, 107 S.Ct. at 522 (reaffirming holding in *Lego v. Twomey*, 404 U.S. 477, 92

S.Ct. 619, 30 L.Ed.2d 618 (1972)). "The prosecution[, however] does not need to show that a waiver of *Miranda* rights was express." *Berghuis v. Thompkins*, 560 U.S. 370, 384, 130 S.Ct. 2250, 2261, 176 L.Ed.2d 1098 (2010). As such, a waiver of a Defendant's *Miranda* rights may be either express or implied. *Id.*

"As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis v. Thompkins*, 560 U.S. 370, 385, 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098 (2010) (citations omitted). "Several factors to consider are (i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system." *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007) (citations omitted). The constitutional validity of Defendant's waiver is questionable where police conduct "deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 1142, 89 L.Ed.2d 410 (1986). "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Id.* at 422-23, 106 S.Ct. 1141.

Furthermore, "[a]n interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect." *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (citations omitted). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or

psychological coercion or by improper inducement so that the suspect's will was overborne." *Id.* (citations omitted).

Here, Defendant Osman sought to speak with law enforcement and invited them to his home. Hr'g Tr. 2/27/2019 (Doc. 95) at 8:18–9:4, 12:5–23, 21:11–15, 22:8–15, 24:5–11. During the interview, when Defendant Osman said he did not want to speak about a subject, the agents changed the topic. *Id.* at 34:19–35:2. From the outset, Defendant Osman sought a guarantee or promise that he would receive a lesser charge. *Id.* at 26:13–27:7, 54:21–55:13, 61:2–16. The agents responded that the only guarantee or promise that they could make was to speak to the prosecutor and report Defendant Osman's cooperation in an effort to obtain leniency. *Id.* at 27:4–22, 29:19–30:1, 46:15–25, 47:17–49:10, 52:8–53:17, 55:3–57:3, 57:12–58:20, 59:1–12, 61:2–62:16, 70:8–71:20, 73:18–25, 74:16–23, 75:7–76:12. Such promises by agents do not render Defendant Osman's statement involuntary. *See Guerrero*, 847 F.2d at 1366.

Defendant Osman argues that SA Cruikshank's statements indicating that the possibility for Defendant Osman's family to stay in the United States, depended upon Defendant Osman speaking with the agents, as coercive. Defendant Osman submitted supplemental authority in support of this argument. In *United States v. Tingle*,[2] the Ninth Circuit Court of Appeals recognized that "[w]hen law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert the 'improper influence' proscribed by Malloy.[[3]]" *Tingle*, 658 F.2d at 1336; *see also Brown v. Horell*, 644 F.3d 969, 980 (9th Cir. 2011) (recognizing *Tingle* proscription applies equally to paternal relationship with child). The agent in *Tingle* "recited a virtual litany of the maximum penalties for the crimes of which Tingle was suspected, totaling 40 years imprisonment[,] . . . [and said] that Tingle would not see her two-year-old child 'for a while.'" *Tingle*, 658 F.2d at 1336. In *Brown*, the court noted that Officer Overall "expressly conditioned Brown's ability to

---

[2] 658 F.2d 1332 (9th Cir. 1981).

[3] *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

- 14 -

be with his child on his compliance with her questioning." *Brown*, 644 F.3d at 981. The court went on to state, "Were this case on direct review, the above analysis would likely lead us to conclude that Overall's tactics were coercive under *Haynes, Lynumn* and *Tingle* and that [Brown's] admissions should therefore have been suppressed." *Id.* The matter, however, was before the court on habeas review. *Id.*

The relevant dialogue between SA Cruikshank ("IC"), SA Trentlage ("BT"), and Defendant Osman ("MO") is as follows:

IC: Here's what I would like to see as the outcome. I would like to see you, your wife, and your children stay here, your children go to school here, your wife continue to work, you can continue to work and you know, make some money. And y-you—

BT: Go to school.

IC: Yeah, you're going to school, your—your, you know—

MO: That's possible?

BT: Yeah, I mean—

IC: That's possible.

BT: What—

IC: That's what I would like to see but, unless we have the conversation that we wanna have, that is not likely at all, okay? But it's a possibility. You don't wanna—you don't wanna throw that away.

BT: Possibility—it just starts from a place of us talking, you know? And you don't have to feel like—you don't have to tell us everything, right? You don't have today. You know, we can—we can do this slowly, we could start from just the base level, right? We can get to know each other, we can talk a little today—

IC: Yeah.

BT: —we can talk a little in a few days, you know?

IC: Yeah, we can build that trust—

BT: Yeah.

IC: —to where you—we can prove to you that we're being honest with you.

| | | |
|---|---|---|
| 1 | BT: | You know? |
| 2 | IC: | And that way you can continue to—we—we would rather have a relationship with you— |
| 3 | | |
| 4 | BT: | Yeah. |
| 5 | IC: | —where we continue to talk to you. That is i-it's a big part of what we do, is—is talking to people that have, uh, initially been people that we've looked at for cases, because they've go information that's more important to us than whatever charge we were looking at, at the beginning. |
| 6 | | |
| 7 | | |
| 8 | BT: | A lot of people try— |
| 9 | MO: | Okay, this charge is—it is for me or all for all of my family? |
| 10 | | |
| 11 | IC: | You. But, your wife also is—has been supporting it. So, but right now it—it's just you. |
| 12 | BT: | But, you understand, the situation can— |
| 13 | IC: | Yeah. |
| 14 | BT: | —affect your entire family. So, you know, like what happens can affect everybody. So, what—what would be the—what would be the best outcome in your mind? Like, what—what would you like to happen? What would you like to be the end result of all this? |
| 15 | | |
| 16 | | |

Verbatim Tr. 6/27/2017 Interview, Hr'g Exh. "1" at ALL-772–ALL-773.

SA Cruikshank and SA Trentlage focused on Defendant Osman's concern of his family in an effort to get him to talk to them. They did not, however, go as far as investigators in *Tingle* and *Brown*. In those cases, the threat was express—a failure to cooperate would remove Tingle's and Brown's ability to be with their children. SA Cruikshank and SA Trentlage did not threaten that Defendant Osman would not be able to see his children; however, SA Cruikshank did leverage Defendant Osman's desire for his children to remain in the United States. *See* Hr'g Tr. 2/27/2019 (Doc. 95) at 35:11–14, 63:20–65:8. The agents also talked to Defendant Osman about the need for honesty in developing trust between them and appealed to his sense of community with America. *See id.* at 59:13–61:1, 68:20–69:20.

Although a close call, the Court finds that the agents' statements to Defendant

were not "sufficiently compelling to overbear his free will and rational intellect." *Id.* at 1367. Based on the totality of the circumstances, Defendant's statement was voluntary, and his motion to suppress should be denied.

### III. CONCLUSION

The Court finds that based upon the totality of the circumstances, Defendant Osman's statement was voluntary and consistent with due process. As such, his motion to suppress should be denied.

### IV. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Judge DENY Defendant Mohammed Abdirahman Osman's Motion to Suppress Involuntary Statement (Doc. 62).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. No reply shall be filed unless leave is granted from the District Court. If objections are filed, the parties should use the following case number: **CR-18-01584-TUC-RM**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 30th day of April, 2019.

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge